| UNITED STATES DISTRICT COURT | NOT FOR PUBLICATION |
| EASTERN DISTRICT OF NEW YORK | |

DAVID ROBINSON,

       Plaintiff,

– against –      **MEMORANDUM & ORDER**

CITY OF NEW YORK, ET AL.,   16-CV-546 (ERK) (ST)

       Defendants.

KORMAN, *J.*:

  Plaintiff David Robinson ran from police following a suspected drug sale. The chase ended, according to Robinson, when he ran diagonally from the sidewalk into a four-lane intersection to avoid being caught by the officer chasing him on foot and was struck by a police vehicle driven by Officer Terrence Howard. Subsequently, Robinson brought suit against Howard, another officer on the scene, and the City of New York, asserting federal and state causes of action alleging excessive use of force. Defendants now move for summary judgment on all claims.

## BACKGROUND

  In the early evening of November 4, 2014, Sergeant David Leonardi and Officers Terrence Howard, Eduardo Cornejo, and David Esparragoza were patrolling the streets of Brooklyn together in an unmarked police vehicle driven by Officer Howard. Defs.' & Pl.'s Rule 56.1 Statements, ECF Nos. 55, 60 ("56.1 Stmts."), at ¶ 1. "Hand to hand right there," Howard said to the other officers, referring to Robinson and another man exchanging a clear plastic bag on the sidewalk to the right of the vehicle. *Id.* ¶¶ 4–6; Zelman Decl. Ex. B, ECF No. 59-2 ("Howard Dep."), at 15:10–25; 27:23–25. Howard then slowed the car, and one of the officers asked the men, "what's up guys, how y'all doing?" Zelman Decl. Ex. A, ECF No. 59-1 ("Robinson Dep."), at 27:12–18. As the men began to walk away, Sergeant Leonardi and Officers Cornejo and Esparragoza exited the vehicle.

*Id.*; 56.1 Stmts. ¶¶ 8–9. Although some of the officers were in plainclothes, Robinson saw one officer's badge and bulletproof vest and realized that the men approaching him were police. 56.1 Stmts. ¶ 11. Fearing being caught with marijuana in violation of his parole, Robinson took off running. *Id.* ¶ 13.

The chase took place on Marcy Avenue, a one-way street with two lanes of northbound traffic. Zelman Decl. Ex. D, ECF No. 59-4 ("Esparragoza Dep."), at 13:18–20; Howard Dep. 14:23–24, 27:19–21. Cars were parked at the sides of the street facing the direction of travel. Howard Dep. 27:8–10. Robinson ran northbound on the eastside sidewalk of Marcy Avenue, toward Lexington Avenue, a one-way street with two lanes of westbound traffic.[1] 56.1 Stmts. ¶ 12; Howard Dep. 19:20–20:2, 27:19–25. Officer Cornejo chased Robinson down the same sidewalk on foot, and Officer Esparragoza ran parallel to Cornejo on the right-hand side of the street, to the west of the parked cars. Esparragoza Dep. 17:18–25; 56.1 Stmts. ¶¶ 17–19.[2] Officer Howard followed by car in the right-hand lane in a path parallel to the chase underway to Howard's right. 56.1 Stmts. ¶ 20; Howard Dep. 27:19–22; *see* Figure 1 below.

Dashing down the sidewalk, Robinson tossed aside the plastic bag of marijuana he was carrying. 56.1 Stmts. ¶ 16. With the officer on foot gaining on him and just a few feet away,

---

[1] Although there is no testimony indicating that Lexington Avenue is a one-way street with two lanes of westbound traffic, I take judicial notice of these facts. *See* PRINCE, RICHARDSON ON EVIDENCE § 2-204(g) (11th ed. 1995) (noting that courts may take judicial notice of "the general direction of city streets and avenues . . . as well as prevailing traffic conditions" (citations omitted)).

[2] Though Robinson could not identify which officer chased him on foot down the sidewalk, it was Officer Cornejo, according to Sergeant Leonardi and Officer Esparragoza. Zelman Decl. Ex. C, ECF No. 59-3 ("Leonardi Dep."), at 30:24–31:2; Esparragoza Dep. 14:11–14. In addition, while paragraphs 17 and 19 of Robinson's Response to Defendants' 56.1 Statement state that "[o]nly one officer ran after plaintiff," the transcript excerpt cited demonstrates only that Robinson was "not sure" if another officer was chasing him. Robinson Dep. 35:15–23. It is therefore uncontested that both Officers Cornejo and Esparragoza were chasing Robinson on foot.

Robinson turned to his left to cross the upcoming intersection. *Id.* ¶¶ 22–23. Officer Howard in the vehicle then "moved up to try to cut off [Robinson's] path in front," in an attempt to make a "tactical stop." Howard Dep. 47:9–12, 48:16–21.



**Figure 1.***

**This diagram is for demonstrative purposes only and does not represent the precise locations, paths, or scale of the persons and objects depicted.*

As Officer Esparragoza explained, "Our tactics are pretty much box the [suspect] in to be able to get him without getting any further distance on us. By tactical, I mean getting the car far enough ahead of him where the [police officer] can get out of the car and either run towards [the suspect] or have the [the suspect move] so the other guy can catch him." Esparragoza Dep. 23:19–24:6. Consistent with this description of a tactical stop, Officer Howard testified that he drove the car "no more than maybe five or ten . . . miles an hour," before he "just stopped in [Robinson's] pathway to try to cut off [Robinson] from fleeing." Howard Dep. 26:20–21, 48:20–21. Robinson ran "off the sidewalk . . . in approximately the same area where pedestrians would come out to walk across the street," diagonally from the southeast corner of the intersection toward the

3

northwest corner. *Id.* at 46:13–47:3. Howard claims that he stopped his car in the intersection, and one second later, Robinson ran into the front-right side of the stopped police vehicle near the headlight. *Id.* at 33:7–21; 35:12–15; 47:13–49:10.

Robinson's account is similar, except he claims that Howard's car was moving at the time of the collision:

> As I'm running I'm on the sidewalk, from the sidewalk I cut into the street. Cross the other sidewalk, his partner is chasing me. As his partner's chasing me, he drives the car towards me. The car strikes me, that's when his partner caught me.

Robinson Dep. 41:4–8. Robinson testified that the car was "in the middle of the street" at the intersection of Marcy and Lexington when it hit him. *Id.* at 41:17–25; *see* Figure 1 above. He could not remember whether the front or side of the car hit him, how fast the car was moving, or if it was speeding. *Id.* at 42:6–13. According to Robinson, he glanced to his left, saw the car heading toward him, and had no time to move out of the way before it hit him. *Id.* at 43:9–14. Robinson agreed, however, that Howard put on his brakes "immediately" upon impact. *Id.* at 42:19–23.

The collision knocked Robinson to the ground, causing injury to the left side of his body, including his elbow, hip, and knee. *Id.* at 44:1–9, 46:23–47:1, 69:21–22, 73:16–17, 74:10–75:1, 85:15–88:25; Zelman Decl. Ex. E, ECF No. 59-5 ("Medical Records"); Zelman Decl. Ex. F, ECF No. 59-6 ("Ltr. Aff."). On the scene, Robinson did not notice any bleeding as a result of the collision. Robinson Dep. 46:19–21. Immediately afterward, police arrested Robinson and transported him to the precinct, where Robinson noticed "a few scrapes" on his knee and elbow. *Id.* at 46:23–47:1. At the precinct, Robinson complained of injuries and was transported to the hospital for further evaluation. *Id.* at 62:24–25, 65:12–21; *see also* Medical Records, ECF No. 59-5. The hospital records indicate that Robinson "[s]ustained blunt trauma to left side chest, left shoulder, left hip & left knee" and that he was prescribed Naproxen, but do not reference any fractures or other injuries. Medical Records, ECF. No. 59-5, at 1. Though Robinson thought

someone at the hospital informed him he had suffered fractures, no fractures appear on the x-rays taken. *See* Ltr. Aff., ECF No. 59-6, at 1, 6. The hospital also provided Robinson with an arm sling and knee brace. Robinson Dep. 74:22–75:1. While Robinson claims to suffer from neck pain, he did not report neck injuries at the hospital and testified that the neck pain was "nothing serious . . . like a muscle spasm, it wasn't like, from the injury or nothing" and was "maybe because of the way I was leaning, like, in the [police] car" and "not from being hit by the car." *Id.* at 69:21–70:19.

Dr. Leonard Harrison, who was retained by Robinson, conducted an orthopedic evaluation of Robinson in June 2017 and filed a letter affidavit in this action dated July 20, 2017—more than two and a half years after the incident. Ltr. Aff., ECF No. 59-6, at 1. His affidavit begins by recounting Robinson's treatment for numerous injuries sustained over the years, including a gunshot wound to the abdomen in 2001; a fight on December 1, 2014 (less than one month after the collision); and a motor vehicle accident affecting the left knee on April 2, 2015. *Id.* at 1, 4–5. Notwithstanding Robinson's extensive history of injuries—and conceding that it is not certain "what injuries were sustained with [Robinson's] fight in the prison"—Dr. Harrison "diagnose[d]" Robinson with several ailments allegedly connected to the collision at issue. *Id.* at 5. Dr. Harrison's diagnoses include "traumatic cervical myositis" (neck inflammation),[3] "olecranon bursitis" (elbow inflammation),[4] and "traumatic left knee chondromalacia" (softening of the knee cartilage).[5] *Id.* Dr. Harrison also concludes that Robinson "has partial permanent disability of the cervical spine, left elbow and left knee, directly related to [the collision]." *Id.*

---

[3] PDR MEDICAL DICTIONARY 314, 1171 (1st ed. 1995).

[4] *Id.* at 254, 1242.

[5] *Id.* at 332.

**DISCUSSION**

Following the incident, Robinson was charged with misdemeanor marijuana possession and later pleaded guilty to a related charge. 56.1 Stmts. ¶¶ 43–44. He then filed a complaint alleging excessive force and failure to intervene under 42 U.S.C. § 1983 and state-law tort claims against Officer Howard, Sergeant Leonardi, Officer Michael Schiaffo,[6] and the City. Defendants now move for summary judgment on all claims.

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Viewing the facts in the light most favorable to the party opposing the motion, *Matsushitsa Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), a genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

### I.  *Federal Claims Against Officer Howard*

Robinson alleges that Howard violated his Fourth Amendment right against unreasonable seizures by using excessive force to detain him.[7] Defendants argue that Robinson fails to make out a triable issue of fact on this claim and, in any event, that Howard is entitled to qualified immunity.

---

[6] Plaintiff concedes that Schiaffo was not involved in this incident at all and "takes no issue with the dismissal of officer Schiaffo from this matter." Mem. of Law in Opp'n To Defs.' Mot. for Summ. J., ECF No. 58 ("Opp."), at 11. All claims against Schiaffo are therefore dismissed as unopposed.

[7] To the extent Robinson also claims Officer Howard failed to intervene to prevent Officer Howard's own actions, those claims are without merit because the very premise of a § 1983 failure-to-intervene claim is an officer's failure to "prevent *fellow officers*" from taking unconstitutional action. *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (emphasis added).

A. Constitutional Violation

To succeed on his excessive-force claim, Robinson must first establish a "constitutionally cognizable seizure" under the Fourth Amendment. *Medeiros v. O'Connell*, 150 F.3d 164, 167 (2d Cir. 1998). A Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied*." *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (emphasis in original) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989)). For example, the Supreme Court held that an accidental collision was not a seizure where the police "sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit." *Id.*; *see also California v. Hodari D.*, 499 U.S. 621, 626 (1991) (explaining that seizure of a person "requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority"). Even though the police may have wanted to catch the suspect, the collision itself was not intended to terminate the suspect's freedom of movement. *County of Sacramento*, 523 U.S. at 844. "[A]ll Fourth Amendment violations require intentional actions by officers, rather than 'the accidental effects of otherwise lawful government conduct.'" *Hudson v. New York City*, 271 F.3d 62, 69 (2d Cir. 2001) (emphasis and citation omitted).

On the other hand, a seizure occurs when the police stop a suspect by intentionally applying force that impedes his or her movement. *See Conwan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 763–64 (2d Cir. 2003) (explaining that the Fourth Amendment applies where an officer shoots a suspect "to stop her from getting away"). Intentionally striking a fleeing suspect with a police vehicle is therefore a seizure. *Brower*, 489 U.S. at 597 ("If . . . the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure."); *see Hartman v. County of Nassau*, 350 F. App'x 477, 479 (2d Cir. 2009) (applying Fourth Amendment where police officer purposely drove into suspect fleeing on foot). Even without direct force, it is "enough for a seizure that a

7

person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Brower*, 489 U.S. at 599. This includes "the establishment of a roadblock . . . designed to produce a stop by physical impact if voluntary compliance does not occur." *Id.* at 598.

"Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). To determine the objective reasonableness of an officer's actions, courts consider "at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). This analysis should account for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006)).

The evidence is insufficient to create a triable issue of fact as to whether Howard intentionally hit Robinson with a moving vehicle for the purpose of effectuating the arrest. Robinson testified only that the police car drove "towards [him]" and that he saw it approaching to his left prior to impact, after running into the intersection. Robinson Dep. 42:14–43:11. This is consistent with Officer Esparragoza's testimony that Howard drove straight and never turned the vehicle in Robinson's direction. Esparragoza Dep. 19:7–9. While Howard admits that he saw Robinson start to run from the sidewalk toward the street and moved his vehicle up to effect a "tactical stop" to "cut [him] off," this shows only that Howard intended to eventually block Robinson's path. *See* Howard Dep. 31:7–14, 47:22–49:10. There is no testimony that a "tactical

8

stop" involves hitting the suspect with the moving car, as plaintiff suggests. Rather, Howard's goal was to "stop[] in [Robinson's] pathway to . . . cut off [Robinson] from fleeing." *Id.* at 47:9–48:21. Even if Howard unexpectedly collided with Robinson before he could stop the car in Robinson's path, there is no evidence that Howard intended to do so. *See Brower*, 489 U.S. at 596–97 (explaining that "governmentally caused and governmentally *desired* termination of an individual's freedom of movement" is insufficient to establish a Fourth Amendment seizure).

Indeed, at no point did Robinson testify that the police vehicle accelerated toward him, *see Pierce v. City of New York*, 293 F. Supp. 3d 306, 310 (E.D.N.Y. 2017); turned to strike him, *see Hartman v. County of Nassau*, No. 04 CV 1784 (CLP), 2008 WL 1923127, at *10 (E.D.N.Y. Apr. 28, 2008), *aff'd*, 350 F. App'x 477 (2d Cir. 2009); or continued moving after impact, *see Epifan v. Roman*, No. 3:11-cv-02591-FLW-TJB, 2014 WL 4828606, at *12 (D.N.J. Sept. 29, 2014). Nor does Robinson point to any inconsistency in Howard's testimony that could lead a jury to doubt his account that he did not intend to hit Robinson. *Compare Soto v. Gaudett*, 862 F.3d 148, 162 (2d Cir. 2017) (officer's shifting story could lead jury to believe that he intentionally struck plaintiff with car). Rather, Robinson ran into an intersection serving two lanes of northbound and two lanes of westbound traffic without looking for oncoming vehicles until it was too late to avoid colliding with the police car. He also agrees that Howard braked and the car came to a stop "immediately" upon impact. Robinson Dep. 42:19–23. Robinson's speculation that Howard must have intended to hit him because the other officers could not catch up with him is just that. With no evidence to the contrary, a jury could only conclude that Howard accidentally hit Robinson before he was able to stop in Robinson's path, or that Robinson ran into Howard's stopped car.[8]

---

[8] Defendants claim that Howard "stop[ped] his car in plaintiff's pathway to try to 'cut off [plaintiff] from fleeing,'" causing plaintiff to run into the vehicle. Defs.' Reply Mem. Law in Further Supp. of Mot. Summ. J., ECF No. 61, at 3. This course of events would constitute a Fourth Amendment seizure because Robinson "was meant to be stopped by the physical obstacle . . . and

9

*See Evans v. Hightower*, 117 F.3d 1318, 1320–21 (11th Cir. 1997) ("Evans failed to offer any evidence that the act of running him over with a patrol car was intended as a means to seize him."); *Swift v. McNatt*, No. 15-1009, 2015 WL 9165967, at *3–4 (W.D. Tenn. Dec. 16, 2015) (finding no seizure and no constitutional violation where officer hit plaintiff in attempt to block escape route because "[a]lthough [p]laintiff was struck as a result of [d]efendant's choice, within the context of the rapidly unfolding events . . ., the fact of the accident itself is not evidence that [defendant] intended to apprehend [plaintiff] by striking him with his police cruiser"); *Lewis v. City of Toledo*, No. 3:10CV2549, 2012 WL 112529, at *2–3 (N.D. Ohio Jan. 12, 2012) (finding no seizure and no constitutional violation due to insufficient evidence of intent to hit plaintiff with police cruiser where officer hit plaintiff while "corralling him[] or boxing him in" to prevent escape); *Kelley v. City of Southfield*, No. 06-13189, 2007 WL 1343265, at *1, 3 (E.D. Mich. May 7, 2007) (finding no seizure and no constitutional violation where officer struck plaintiff while attempting to position vehicle to block plaintiff's path and plaintiff offered no evidence to the contrary).

The nature of Robinson's injuries only supports this finding. Following the collision, Robinson sought medical attention after returning to the precinct and even then only noticed a few scrapes. Robinson Dep. 46:23–47:1. Though Robinson was later prescribed pain medication, there is no evidence that he sustained any fractures or serious injuries. *See* Medical Records 1; Ltr. Aff. 5. Almost three years later, plaintiff's expert attempts to diagnose Robinson with various ailments connected to the collision relating to the left elbow, left knee, and neck. Dr. Harrison attributes these issues to the collision, even though Robinson had sustained multiple physical injuries over

---

[] he was so stopped." *Brower*, 489 U.S. at 599. Because Robinson does not argue that using a car as a roadblock to stop his path of flight violated the Fourth Amendment, I do not address it here. *See* Opp. 9 ("Plaintiff alleges that the officers intentionally hit him with the police vehicle in an attempt to stop and arrest him. This has been plaintiff's claim from the commencement of this case . . . .").

the years, including a fight within a month of the collision and a separate automobile accident affecting the *same knee* Robinson claims was injured in the collision at issue. Ltr. Aff. 5. Moreover, Robinson expressly denied that his neck injury was related to the collision during his deposition.[9] Robinson Dep. 69:21–70:19. Regardless, untangling the medicalese reveals diagnoses of inflammation to the neck and elbow and softening of the knee cartilage, which, without more, lend no further credence to Robinson's allegation that he was struck by a moving vehicle. *See Dreher v. Syracuse Police Dep't*, No. 5:07cv1162 NPM/GHL, 2010 WL 5070872, at *6 (N.D.N.Y. Dec. 7, 2010) (non-serious injury did not support allegation that plaintiff was hit by police car, especially in light of "credible testimony" by officers that "plaintiff . . . ran into the police car"); *Collins v. Ferguson*, No. 17-CV-10898, 2017 WL 4387287, at *4 (E.D. Mich. Oct. 3, 2017) ("Given the severity of Collins' injuries, it appears plausible that the police cruiser struck him rather than he merely ran into the vehicle himself.").

For these reasons, Robinson fails to establish a Fourth Amendment seizure and a predicate constitutional violation for his excessive force claim, and summary judgment is granted on the excessive force claim against Howard. On the premise that the plaintiff was not seized, defendants argue that plaintiff's claims should be evaluated through the lens of the Fourteenth Amendment. While the complaint alleges both a Fourth and Fourteenth Amendment violation, the plaintiff does press that the conduct alleged violates the Due Process Clause. Regardless, the analysis above demonstrates that plaintiff cannot establish that Howard harbored "a purpose to cause harm unrelated to the legitimate object of arrest" to "satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *County of Sacramento*, 523 U.S. at 836

---

[9] In fact, Robinson testified that his neck pain amounted to "a little muscle cramp or something, but nothing serious," resulting "not from being hit by the car" but from "the way [he] was leaning" in the police car on the way to the precinct. Robinson Dep. 69:23–70:19.

(holding police officer does not "violate[] the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender").

    B.  Qualified Immunity

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quotation marks and citation omitted), and "protects all but the plainly incompetent or those who knowingly violate the law," *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). Therefore, qualified immunity protects an officer whose actions "f[a]ll in the 'hazy border between excessive and acceptable force.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," in light of judicial precedent. *Id.* at 199 (quotation marks and citation omitted). "The objective reasonableness test is met—and the defendant is entitled to immunity—if officers of reasonable competence could disagree on the legality of the defendant's actions." *Hamilton v. City of New York*, No. CV-07-3633(DGT), 2009 WL 2226105, at *6 (E.D.N.Y. July 23, 2009) (quoting *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999)).

Although in the absence of an underlying constitutional violation it is unnecessary to reach the issue, I find in the alternative that Howard is protected by qualified immunity. As discussed, the only reasonable view of the evidence is that Howard accidentally hit Robinson before he could stop his car in Robinson's path or that Robinson ran into Howard's stopped car. Both scenarios involve the use of the "tactical stop" maneuver in a fast-moving foot pursuit. As described by Officers Howard and Esparragoza, the maneuver involves strategically stopping the police vehicle in the suspect's path of flight. Here, Howard's attempt at a "tactical stop" was not prohibited by

law. Howard's uncontroverted testimony is that he followed the ongoing foot chase in his car at a slow speed of five to ten miles per hour. He then sought to prevent Robinson from escaping by using the police vehicle as a barrier to cut off a potential escape route, and in the meantime, Robinson ran out into the intersection from the sidewalk before coming into contact with Howard's vehicle. Fully crediting Robinson's nearly identical version of events—that Howard's car was moving before it braked to immediate stop upon impact—does not alter this analysis. While Howard noticed that Robinson was heading from the sidewalk toward the street, he had no reason to believe that Robinson would run into the intersection without checking for oncoming traffic. Howard's decision to block Robinson's path in this "tense, uncertain, and rapidly evolving" pursuit was not clearly unconstitutional. *Cf. Jones*, 465 F.3d at 61. I am aware of no precedent indicating that a suspect running from police on foot has a right against having his path of flight blocked with a stopped (or nearly stopped) police vehicle. Accordingly, any constitutional violation was not based on a clearly established right, and Howard is entitled to qualified immunity.

## II.  *Federal Claims Against Sergeant Leonardi*

Robinson claims that Sergeant Leonardi "should remain as a defendant in this matter as his failure to intervene and/or participation in the excessive force are jury issues." Opp. 11. Because the only force Robinson alleges is the collision with the vehicle driven by Howard, I assume that his reference to Leonardi's "participation in the excessive force" alludes to supervisory liability under § 1983. *See also* Pl.'s Resp. to Defs.' Rule 56.1 Statement, ECF No. 60, at ¶ 53 ("Sgt. Leonardi was on the scene of these arrests and, as the ranking officer, the final say was his as to how this stop transpired."). Because Robinson fails to establish an underlying constitutional violation, summary judgment must be granted on the claims against Leonardi. *See Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999); *Walker v. City of New York*, No. 15 CV 500 (NG) (ST),

2017 WL 2799159, at *6 (E.D.N.Y. Jun. 27, 2017). Alternatively, Robinson's claims against Leonardi fail for independent reasons.

Though *respondeat superior* liability is unavailable in § 1983 actions, supervisors who are personally involved in a constitutional violation are subject to suit. *Terebesi v. Torreso*, 764 F.3d 217, 233–34 (2d Cir. 2014); *Perez v. Ponte*, 236 F. Supp. 3d 590, 609 (E.D.N.Y. 2017) ("[I]t is well-settled in this Circuit 'that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'") (quoting *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010)). A supervisor is only liable where he or she is a "direct participant" in the constitutional violation, which "includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally." *Terebesi*, 764 F.3d at 234.

A plaintiff can also establish liability under § 1983 by showing that an officer failed to intervene to prevent the application of excessive force. "A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016). Sustaining a claim for failure to intervene requires evidence sufficient "to permit a jury reasonably to conclude that [the officer's] failure to intercede was a proximate cause" of the harm and that there was a "realistic opportunity" to prevent it. *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988). "In each case, the question whether a defendant had a realistic chance to intercede will turn on factors such as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." *Figueroa*, 825 F.3d at 107. Although not dispositive, the duration of the alleged misconduct "will frequently assume great importance." *Id.* "The essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene

permits a reasonable conclusion that he became a 'tacit collaborator' in the unlawful conduct of another." *Id.* at 107–08.

First, Robinson fails to establish supervisory liability on the theory that Leonardi was a "direct participant" in the alleged constitutional violation. While Robinson asserts "Defendant Leonardi was either running after Robinson or in the vehicle being driven at Robinson," he provides no basis for that assertion beyond pure speculation and—in contradictory fashion—also admits that Leonardi exited the car prior to the collision. 56.1 Stmts. ¶¶ 8, 49. Even if it were true that Leonardi chased Robinson or were in the vehicle at the time of the collision, Robinson offers no evidence at all that Leonardi "authoriz[ed], order[ed], or help[ed]" Howard hit Robinson with the vehicle. *Terebesi*, 764 F.3d at 234; *see Wilson v. Celestin*, No. 17-CV-5592 (MKB), 2018 WL 2304762, at *3 (E.D.N.Y. May 18, 2018) (collecting cases). Because "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," Robinson's unsupported allegation that Leonardi directly participated in using excessive force against Robinson cannot withstand summary judgment. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks and citation omitted).

Second, Robinson contends that Leonardi is liable for failing to stop Officer Howard's excessive use of force. Opp. 11. But, as discussed, Robinson points to no evidence suggesting that Leonardi was in the vehicle with Howard, chased Robinson, or witnessed the collision. To the contrary, Leonardi claims that he was confronting and arresting the second suspect at the time of the chase, to which Robinson offers only conclusory allegations. 56.1 Stmts. ¶¶ 49–51. Moreover, the chase lasted only a matter of seconds, and Robinson offers no explanation or theory as to how Leonardi could have possibly intervened to stop the collision. *Accord Pierce*, 293 F. Supp. 3d at 313 (finding insufficient evidence to support failure-to-intervene claim where plaintiff alleged officer in passenger seat could have stopped officer driving from accelerating into plaintiff). On

these facts, no reasonable juror could conclude that Leonardi had a realistic opportunity to intervene in the chase. *Johnson v. City of New York*, No. 05 Civ. 7519 (PKC), 2008 WL 4450270, at *6 (S.D.N.Y. Sept. 29, 2008) (officers had no opportunity to intervene where use of excessive force lasted only seconds).

### III. *Federal Claims Against the City*

Robinson also asserts that the City is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Again, because Robinson fails to establish an underlying constitutional violation, his claims against the City must also fail. *See Curley v. Village of Suffern*, 268 F.3d 65, 71 (2d Cir. 2001). These claims are also foreclosed on independent grounds.

To succeed, Robinson must first demonstrate "the existence of a municipal policy or custom" that precipitated the harm. *Sarus v. Rotundo*, 831 F.2d 397, 400 (2d Cir. 1987) (quotation marks and citations omitted). "The alleged custom or practice need not be embodied in a rule or regulation," *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996)), but "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law," *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In "limited circumstances," a municipality can also be held liable under § 1983 for failing "to train certain employees about their legal duty to avoid violating citizens' rights," *id.*, but "'only where the failure to train amounts to deliberate indifference to the rights' of members of the public with whom the employees will interact," *Green*, 465 F.3d at 80 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *see Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004).

Here, Robinson proffers no policy or custom supporting his claims against the City. He relies solely on the single event alleged in the complaint. Yet without more, "isolated acts of excessive force by non-policymaking municipal employees are generally not sufficient to

demonstrate a municipal custom, policy, or usage that would justify municipal liability." *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012); *Johnson v. City of New York*, No. 12-CV-2484 (ENV), 2012 WL 2394894, at *1 (E.D.N.Y. June 25, 2012) ("Neither the mere recitation of a failure to train municipal employees nor of a single incident . . . is sufficient to raise an inference or the existence of a custom, policy, or practice."). Because Robinson "complains of only one incident without proof of any policy or custom," summary judgment is granted in favor of the City. *Pittman v. Incorporated Village of Hempstead*, 49 F. Supp. 3d 307, 319–20 (E.D.N.Y. 2014); *see C.G. ex rel. Gonzalez v. City of New York*, No. 12-CV-1606 (ARR)(VVP), 2013 WL 5774291, at *12 (E.D.N.Y. Oct. 24, 2013).

## IV. *Pendent State-Law Claims*

Robinson also asserts causes of action for negligence and *respondeat superior* under New York law, which defendants argue are barred by Robinson's failure to timely file a notice of claim. By statute, a plaintiff asserting tort claims against the City, or its officers or employees, must serve a notice of claim "within ninety days after the claim arises." N.Y. GEN. MUN. LAW §§ 50-e(1)(a), 50-k(6), 50-i(1) (2013); *see Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999); *Warner v. Vill. of Goshen Police Dep't*, 256 F. Supp. 2d 171, 174 (S.D.N.Y. 2003). Even where the notice of claim is not filed within the ninety-day period, an "application for . . . extension may be made before or after the commencement of the action but not more than one year and 90 days after the cause of action accrued, unless the statute has been tolled." *Pierson v. City of New York*, 56 N.Y.2d 950, 954 (1982); *see* N.Y. GEN. MUN. LAW § 50-e(5). Robinson concedes that he did not file a notice of claim until December 30, 2015, more than a year after the November 4, 2014 incident. Opp. 13. Nor does he allege that he filed an application to extend his time to file the notice within one year and 90 days from when the action accrued. Nonetheless, Robinson contends it is sufficient that he "filed his notice of claim within 90 days of his release from prison."

17

*Id.* Imprisonment, however, does not exempt Robinson from New York's statutory notice-of-claim requirements. *E.g.*, *Lavalliere v. Dep't of Corr. of City of N.Y.*, 759 N.Y.S.2d 8, 9 (App. Div. 1st Dep't 2003). Accordingly, the motion for summary judgment on Robinson's state-law claims is granted.

## CONCLUSION

Defendants' motion for summary judgment is granted, and the complaint is dismissed.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York
September 11, 2018

Edward R. Korman
United States District Judge